**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
JAIME DOE[1],

                                Plaintiff,

              - against -

FEDCAP REHABILITATION SERVICES, INC,
CHRISTINE MCMAHON, *individually*, and
JOSEPH GIANNETTO, *individually*,

                               Defendants.
----------------------------------------------------------------X

Case No.

**AMENDED COMPLAINT**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

Plaintiff, proceeding pseudonymously as JAIME DOE, by their attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1.    Plaintiff complains pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA"), the New York State Human Rights Law, New York State Executive Law, § 296 ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code § 8-107, *et. seq.* ("NYCHRL"), and seeks damages to redress the injuries Plaintiff suffered as a result of being discriminated and retaliated against, by their employer solely due to their **perceived and/or actual disability (breast cancer, depression, anxiety, and Post Traumatic Stress Disorder), sexual orientation (queer), gender (gender non-conforming/genderqueer/ trans masculine), and exercising their rights under the Family Medical Leave Act**.

---

[1] Plaintiff has concurrently filed with this Complaint a motion requesting leave to proceed pseudonymously or, in the alternative, for an order sealing the complaint.

**JURISDICTION AND VENUE**

2.  Jurisdiction of this Court is proper under 42 U.S.C. §12101 *et. seq*., and 28 U.S.C. §§ 1331 and 1343.

3.  The Court has supplemental jurisdiction over the claims of Plaintiff brought under state and city laws pursuant to 28 U.S.C. § 1367.

4.  Venue is proper in this district in that a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of the State of New York. 28 U.S.C. §1391(b).

**PARTIES**

8.  That at all times relevant hereto, Plaintiff Jaime DOE ("DOE" or "Plaintiff") is a resident of the State of New York and County of Kings.

9.  Plaintiff is genderqueer with preferred pronouns of "they," "their," and "theirs."

10. That at all times relevant hereto, Defendant FEDCAP REHABILITATION SERVICES, INC. ("FEDCAP") is a domestic non-profit corporation with an office located at 633 Third Avenue, 6th Floor, New York, New York 10017.

11. That at all times relevant hereto, Plaintiff was an employee of Defendant FEDCAP.

12. Upon information and belief, at all times material, Defendant CHRISTINE MCMAHON ("MCMAHON") was and is an individual residing in the State of New York.

13. That at all times relevant hereto, Defendant MCMAHON was an employee of Defendant FEDCAP, holding the position of "Chief Executive Officer."

14. That at all times relevant hereto, Defendant MCMAHON was Plaintiff's supervisor and/or

2

had supervisory authority over Plaintiff. Defendant MCMAHON had the ability to hire, fire, and affect the terms and conditions of Plaintiff's employment.

15. Upon information and belief, at all times material, Defendant JOSEPH GIANNETTO ("GIANNETTO") was and is an individual residing in the State of New York.

16. That at all times relevant hereto, Defendant GIANNETTO was an employee of Defendant FEDCAP, holding the position of "Chief Operating Officer."

17. That at all times relevant hereto, Defendant GIANNETTO was Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Defendant GIANNETTO had the ability to hire, fire and affect the terms and conditions of Plaintiff's employment.

18. Defendants, FEDCAP, MCMAHON, and GIANNETTO, are collectively referred to herein as "Defendants."

## **MATERIAL FACTS**

19. After several years in social work, Plaintiff DOE was "burnt out". Believing they were no longer effective in the social work role, on or about August 4, 2014, Plaintiff began working for Defendant FEDCAP as a Director of Vocational Services.

20. During their time with Defendant FEDCAP, Plaintiff often reiterated their inability to return to a role centered in social work and their strong desire to advance their career toward executive directorship.

21. Plaintiff began earning an annual salary of $105,000.00. Plaintiff has an expected annual salary for 2017 of $110,000.00.

22. In the Fall of 2014, Plaintiff became very concerned about the culture at FEDCAP. Plaintiff

observed senior staff members referring to individuals with mental health disabilities as being "crazy" and "needing to take their meds." This was done in several meetings. These comments were made by Defendant GIANNETTO, Steve Coons ("Mr. Coons"), Vice President of Total Facilities Management at FEDCAP, and other staff members often with a tone of disdain and dismissiveness toward the population of those who have mental health challenges.

23.    Plaintiff did not feel safe; having recently disclosed their disability (depression, anxiety, PTSD) to Dayneen Caldwell ("Ms. Caldwell"), Vice President of Human Resources. Fearing ridicule if others found out, Plaintiff requested that their disclosure be rescinded.

24.    Plaintiff felt offended the brazenness of the remarks. They interpreted these comments as a discriminatory animus toward people, including Plaintiff's, actual or perceived disabilities (depression, anxiety, and PTSD).

25.    Plaintiff complained to Ms. Caldwell, about these offensive comments. However, nothing was done.

26.    In recognition of their stellar performance, on May 22, 2015 Plaintiff received a $5,000.00 performance-based raise. Defendant GIANETTO discussed the possibility of promoting Plaintiff to a Director of Operations position, in the COO office.

27.    However, on or around June 15, 2015, Plaintiff was diagnosed with breast cancer. Soon thereafter Plaintiff informed Defendants, MCMAHON and GIANNETTO, about their diagnosis.

28.    On or around June 16, 2015, in response to Plaintiff's diagnosis, Defendant GIANNETTO,

stated to Plaintiff that, "[i]n light of our conversation yesterday and your medical condition, we are going to put our conversation about a new position on hold." Plaintiff took the rescission of the position as discrimination towards their perceived disability (breast cancer). This was later confirmed, when Plaintiff later broached the issue again and it was further tabled and never revisited.

29.  On or around June 25, 2015, a Human Resources representative informed Plaintiff, that they were not eligible for FMLA leave because Plaintiff had not been with Defendant FEDCAP for one year. However, Plaintiff was informed that they were eligible to request medical leave.

30.  Plaintiff applied for Defendant FEDCAP's medical leave in accordance with FEDCAP's policies and procedures. However, this request was denied by Defendant GIANETTO. In addition, Plaintiff was encouraged to not take medical leave and to work while in recovery.

31.  On or around June 27, 2015, Defendant MCMAHON, harassed Plaintiff by asking them very invasive questions regarding Plaintiff's upcoming surgery to treat their breast cancer and McMahon's disagreement with Plaintiff's decision to **not** pursue breast reconstructive surgery. This conversation was held in the presence of Roque Gerrald ("Mr. Gerrald"), Senior Vice President of the Education Division.

32.  Defendant MCMAHON stated that "women" get reconstruction and asked Plaintiff if they were transitioning to being male. Defendant MCMAHON also asked Plaintiff about their feelings about their breasts and if Plaintiff ever thought they were male. Defendant MCMAHON continued the tirade by asking if Plaintiff would have wanted gender reassignment surgery, when they were younger, and if Plaintiff would have regretted it, if

Plaintiff did.

33.    Defendant MCMAHON then opined that transgender people just wanted to "get ahead." Defendant MCMAHON went on to state that Caitlyn Jenner[2] was "disgusting and a horrible example of a woman." Defendant MCMAHON's tone was hostile during this discussion. She forcefully stated that she felt it was wrong to transition. This offended Plaintiff and made them feel very uncomfortable.

34.    Plaintiff took the tirade and comments about Caitlyn Jenner as discrimination towards their choice against reconstruction surgery (disability - breast cancer), sexual orientation (queer), and gender (gender non-conforming/genderqueer/trans masculine).

35.    On or about July 2, 2015, Plaintiff had a bilateral mastectomy as their course of treatment for their diagnosis of breast cancer.

36.    In or around July 2015, Defendant MCMAHON harassed Plaintiff, by telling several colleagues, that it was not appropriate and that she was angry, that Plaintiff shared on Plaintiff's caringbridge.org site that Plaintiff's insurance did not cover their mammogram or full surgery. However, the post never mentioned Defendant FEDCAP.

37.    Around this time, Defendant MCMAHON began creating an even more hostile environment by changing the nature of her interactions with Plaintiff. Defendant MCMAHON no longer engaged in discussions regarding Plaintiff's program specifics or agency initiative, or friendly discussions. However, previously, Defendant MCMAHON regularly engaged with Plaintiff in conversation and discussion regarding these initiatives. Afterwards, Defendant

---

[2] In or around this time, Caitlyn Jenner announced that she was transitioning.

MCMAHON has only engaged in perfunctory discussions.

38.     While Plaintiff was recovering from their bilateral mastectomy, they worked from home.

39.     On or about August 10, 2015, when Plaintiff returned to work, they began wearing ties every day, as corporate attire was expected while working at Defendant FEDCAP. Plaintiff's gender identity was visually evident, even before they were open about it.

40.     On October 29, 2015, Plaintiff came out as genderqueer via their caringbridge.org site. This site is known to be monitored by Defendant McMahon.

41.     On or about November 2015, it became necessary for Plaintiff to continue their breast cancer treatments. Defendant GIANNETTO discriminated against Plaintiff by refusing to allow Plaintiff to take FMLA leave, although they were eligible for the FMLA leave. In discussions with Plaintiff, and further in a meeting with Bill Cole ("Mr. Cole"), Senior Vice President of Human Resources, and Dayneen Caldwell ("Ms. Caldwell"), Vice President of Human Resources, Defendant GIANNETTO denied Plaintiff's FMLA leave request for Plaintiff's second surgery, despite all other parties' protests; mandating that Plaintiff work while in recovery.

42.     Upon information and belief, Defendant GIANETTO knew Plaintiff was eligible for FMLA and denied their request knowing it was a violation of law.

43.     Defendants, FEDCAP and GIANNETTO, intentionally violated the FMLA by interfering with Plaintiff's FMLA right to twelve (12) weeks of time off.

44.     On or around November 20, 2015, Plaintiff took time off to have their second surgery to remove remaining breast tissue, left over from their bilateral mastectomy. This time off was

shorter than the 12-week period that Plaintiff was entitled and did not offer the protections afforded under FMLA.

45.    Plaintiff was pressured to work during their recovery period and did in fact work from home during this period of time.

46.    On or about December 2015, Plaintiff returned to work. In or around this time, Defendant FEDCAP required that Plaintiff take on the oversight of a failing program in New Jersey. Defendants did not provide Plaintiff with a promotion or financial compensation. Given the hostile work environment and fear of retaliation, Plaintiff felt that they could not refuse the assignment.

47.    On or about January 12, 2016, Defendant FEDCAP asked Plaintiff to assist with another failing program in Rochester, New York, which increased Plaintiff's travel time by twenty percent. Defendant FEDCAP again did not provide Plaintiff with any promotion or financial compensation for the additional tasks. Given the continued hostile work environment and fear of retaliation, Plaintiff felt that they could not refuse that assignment.

48.    On or about January 13, 2016, Plaintiff had a telephone conversation with Lauri Rasnik ("Ms. Rasnik"), outside counsel at Epstein Becker & Green, to express Plaintiff's complaint that Defendant FEDCAP was: 1) **unfair to individuals with disabilities** and 2) refused to hire any additional deaf employees because they "cause too many problems" and implied that there was no basis to an EEOC complaint filed in Washington DC, despite clear evidence to the contrary. Plaintiff further expressed both their concern that the agency is **unfair and hostile to employees with mental health disabilities**, given Plaintiff's experience as a

8

person with a mental health disability (depression, anxiety, and PTSD), and that Plaintiff was scared to report this to anyone at Defendant FEDCAP because Plaintiff was afraid of retaliation. Ms. Rasnik informed Plaintiff that she would have to inform Defendant GIANNETTO. However, no investigation was done into Plaintiff's complaints and the hostile work environment continued.

49.    On or about June 3, 2016, Plaintiff accepted a position of Associate Director of Occupational Health and Easterseals New York, turning down an offer for the Director of Operations position (which was previously discussed in June 2015 and withdrawn after Plaintiff's disclosure of cancer). However, this change in title did not come with additional compensation, or job description. However, Plaintiff was given clinical and quality assurance oversight of additional programs, one program in New Jersey (added in January 2017), and one program in Delaware, and continued oversight of one New York City, the New Jersey program and the one program in Rochester, New York.

50.    In or around July 2016, Plaintiff began using a gender neutral name with their closest friends.

51.    On or about August 16, 2016, Plaintiff was harassed by Defendant MCMAHON when MCMAHON requested that Plaintiff remove their Facebook cover photo that read, "Fuck Your Normative Ideas About Gender." This post was on Plaintiff's personal, private Facebook page. Plaintiff took this request as discrimination based on Plaintiff's sexual orientation (queer) and gender (gender non-conforming/genderqueer/trans masculine).

52.    On or about August/September 2016, Plaintiff complained to Marchene Noel ("Ms. Noel"), Human Resources Business Partner, and Lyell Ritchie ("Mr. Ritchie"), Senior Vice President

of Economic Development, that Plaintiff was told to remove their Facebook cover photo, but was not offered any documentation or policies stating that Plaintiff had violated any rules and/or had to remove it.

53. On or about September/October 2016, Plaintiff complained to Ms. Noel of Plaintiff's past discriminatory experience as it relates to Plaintiff's requests for leave of absence, FMLA leave, and the directive to take down Plaintiff's Facebook cover photo. However, there was no action taken and no suggestions given.

54. In or around October/November 2016, Plaintiff went public about their cancer, decision to not have breast reconstruction, and transition to genderqueer, in order for others to know that there are other options, other than breast reconstruction, after cancer.

55. On December 26, 2016, Plaintiff married their wife.

56. On March 22, 2017, Plaintiff learned that Paul Lovejoy ("Mr. Lovejoy"), a Program Director and male colleague holding a position junior to Plaintiff, received a bonus and pay raise for taking on oversight of one additional program in Rochester, New York. Plaintiff was never offered additional compensation for all the additional programs that they oversaw.

57. Furthermore, this report indicated that Mr. Lovejoy made approximately $10,000.00 more than Plaintiff, who was making approximately $110,000.00, during the same four-month period. Prior to this bump in salary Mr. Lovejoy was making approximately $85,000 - $90,000 per year.

58. On or about May 26, 2017, Plaintiff legally changed their name. On or about this time, Plaintiff also informed Defendant FEDCAP of this name change.

59.  Beginning around this time, Defendant FEDCAP increased their string of discriminatory actions against Plaintiff because Plaintiff: (1) informed Human Resources that they made a legal name change; (2) requested the use of the preferred "they/them/their" pronouns, when referring to Plaintiff; and (3) Plaintiff's decision to add their preferred pronouns to their e-mail signature, as a means to inform others that Plaintiff prefers to be addressed by gender neutral pronouns.

60.  In response to these requests, Defendants discriminated against Plaintiff by: (1) failing to change Plaintiff's name on their health insurance card, despite multiple requests to Human Resources and the outside vendor, Fedcap Benefits Service Center; (2) failing to change Plaintiff's name on the payroll system; (3) consistently failing to use Plaintiff's requested gender pronouns in numerous conference calls and meetings; and (4) refusing to provide Plaintiff with their paid time off balance.

61.  Plaintiff took this refusal to abide by Plaintiff's requests to be discrimination based on their sexual orientation (queer) and gender (gender non-conforming/genderqueer/trans masculine).

62.  On or around July 11, 2017, Plaintiff complained to Ms. Noel, regarding continued and additional discrimination against Plaintiff via Defendants' refusal to permit Plaintiff's any leave of absence, FMLA leave, unfair financial compensation, and lack of respect by senior staff in using Plaintiff's preferred gender pronouns.

63.  However, despite Plaintiff's continued complaints and their reference to possible legal action, Ms. Noel provided Plaintiff with no assistance in addressing Plaintiff's concerns of discrimination.

64.     On or around July 18, 2017, an issue arose involving a mentally ill patient, which triggered
        Plaintiff's mandated reporting requirement to report incidents of abuse and neglect of clients,
        to the New York State Justice Center, Vulnerable Persons Central Registry. Kenneth Breznoff
        ("Mr. Breznoff"), General Counsel for Defendant FEDCAP, in the presence of Ms. Noel,
        initially refused to provide the requested information to Plaintiff and Mr. Lovejoy. Mr.
        Breznoff denied that the clinic patient had a mental health disorder and made a joke regarding
        whether or not the patient was single and implied that the patient made up the story. Plaintiff
        took this as discrimination based on actual or perceived disability.

65.     On or around July 27, 2017, Plaintiff was further retaliated against by Defendant FEDCAP
        and its subsidiary Easterseals New York ("ESNY"), when they advised Plaintiff that their
        position, with both organizations, was being eliminated.

66.     Donald Harreld ("Mr. Harreld"), ESNY Executive Director, formally told Plaintiff about their
        position being eliminated and provided Plaintiff with no reason for the position being
        eliminated. Making matters worse, Mr. Harreld, casually mentioned that he may be able to
        use Plaintiff in another capacity but first wanted to know if Plaintiff was "transitioning."
        Remembering Defendant McMahon's comments about Caitlin Jenner, Plaintiff nervously
        responded that they, "did not know what they were doing."

67.     However, two straight, cisgender colleagues, Mr. Stenning (Plaintiff's direct supervisor) and
        Robin Pelletier (colleague holding a substantially equivalent position to Plaintiff), who were
        on the same team as Plaintiff were both offered reassignment to new positions.

68.     In addition, as of the date of this Complaint, Defendants fail to update Plaintiff's payroll to

their new name. Plaintiff takes this adamant refusal to change their name on the payroll as discrimination based on Plaintiff's sexual orientation (queer), and gender (gender non-conforming/genderqueer/trans masculine).

69.  **Defendants eliminated Plaintiff's position on the basis of their perceived and or actual disability (depression, anxiety, and PTSD), sexual orientation (queer), and gender (gender non-conforming/genderqueer/trans masculine) and in retaliation for complaining of discrimination**.

70.  On or around August 2nd, Defendants finally updated Plaintiff's health insurance to reflect their new name.

71.  As of August 10, 2017, Plaintiff has not worked at Defendant FEDCAP and has been on short-term disability.

72.  A number of months after Plaintiff's counsel sent a claim letter to Defendants, Defendant FEDCAP offered Plaintiff a demotion to a social worker position; a position, Defendants knew that Plaintiff could not take.

73.  Plaintiff feels offended, disturbed, and humiliated by the blatantly unlawful and discriminatory termination.

74.  Plaintiff has been unlawfully discriminated against, was humiliated, retaliated against, has been degraded and belittled; and as a result, suffers loss of rights, emotional distress, loss of income, earnings and physical injury.

75.  Plaintiff's performance was, upon information and belief, above average during the course of employment with Defendants.

76.    <u>**Defendants' actions and conduct were intentional and intended to harm Plaintiff**</u>.

77.    As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

78.    As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

79.    As a result of the above, Plaintiff has been damaged in an amount which exceeds the jurisdiction limits of the Court.

80.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands Punitive Damages as against all Defendants, jointly and severally.

81.    As a result of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

**AS A FIRST CAUSE OF ACTION**
<u>**FOR VIOLATION OF THE FAMILY MEDICAL LEAVE ACT**</u>

82.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

83.    Section 2612 of the Family Medical Leave Act, states in pertinent part:

> Subject to section 2613 of this title, an eligible employee shall be entitled

14

to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A)   Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B)   Because of the placement of a son or daughter with the employee for adoption or foster care.

(C)   In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D)   Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

84.   Defendants violated Plaintiff's FMLA rights by failing to provide them with appropriate leave thereunder.

### AS A SECOND CAUSE OF ACTION
### FOR INTERFERENCE AND RETALIATION UNDER
### THE FAMILY AND MEDICAL LEAVE ACT

85.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

86.   Section 2612(D) of the Family Medical Leave Act, states in pertinent part: "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period … Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

87.   Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

15

88.     Defendant discriminated against Plaintiff in retaliation for denying their rights under the

        FMLA.

89.     As such, Plaintiff has been damaged as set forth herein.

**AS A THIRD CAUSE OF ACTION**
**UNDER THE NEW YORK STATE LAW**

90.     Plaintiff repeats, reiterates and realleges each and every allegation made in the above

        paragraphs of this Complaint as if more fully set forth herein at length.

91.      Executive Law § 296 provides that

        1.  It shall be an unlawful discriminatory practice: "(a) For an employer or
        licensing agency, because of an individual's age, race, creed, color, national
        origin, **sexual orientation**, military status, **sex**, **disability**, predisposing
        genetic characteristics, marital status, or domestic violence victim status, to
        refuse to hire or employ or to bar or to discharge from employment such
        individual or to discriminate against such individual in compensation or in
        terms, conditions or privileges of employment."

92.     Defendants engaged in an unlawful discriminatory practice by discriminating against the

        Plaintiff because of their actual or perceived sexual orientation.

**AS A FOURTH CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

93.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above

        paragraphs of this Complaint as if more fully set forth herein at length.

94.     The Administrative Code of City of NY § 8-107 [1] provides that,

        It shall be an unlawful discriminatory practice: (a) For an employer
        or an employee or agent thereof, because of the actual or perceived
        age, race, creed, color, national origin, **gender**, **disability**, marital
        status, **sexual orientation** or alienage or citizenship status of any
        person, to refuse to hire or employ or to bar or to discharge from

16

> employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

95.   Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of their disability.

**AS A FIFTH CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**(As Against the Individual Defendants Only)**

96.   Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

97.   The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

98.   Defendants, MCMAHON and GIANNETTO, engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

**AS A SIXTH CAUSE OF ACTION OF DISCRIMINATION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**

63.   Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

64.   New York City Human Rights Law, Administrative Code §8-107(19) provides that:

> Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on

17

account of his or his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

65. Defendants violated the section cited herein as set forth.

66. As such Plaintiff has been damaged as set forth herein.

## AS AN SEVENTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

99. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

100. The New York City Administrative Code Title 8, §8-107 (7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person **has opposed any practices** forbidden under this chapter. . ."

101. Defendants violated the section cited herein as set forth.

## JURY DEMAND

102. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by the Family Medical Leave Act, the New York State Human Rights Law, New York State Executive Law, § 296, and the New York City Human Rights Law, New York City Administrative Code § 8-107, *et. seq.*, in that Defendants discriminated and retaliated against Plaintiff on the basis of their disability, sexual orientation, and gender;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants'

18

unlawful discrimination and retaliation, and to otherwise make them whole for any losses

suffered as a result of such unlawful employment practices;

C.       Awarding Plaintiff compensatory damages for mental, emotional and physical injury,

distress, pain and suffering and injury to their reputation in an amount to be proven;

D.       Awarding Plaintiff punitive damages;

E.       Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the

prosecution of the action;

F.       Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

proper to remedy the Defendants' unlawful employment practices.

Dated:  New York, New York
        October 27, 2017

                                        **PHILLIPS & ASSOCIATES,**
                                        **ATTORNEYS AT LAW, PLLC**


                        By:      ____/s/Marjorie Mesidor_____
                                 Marjorie Mesidor, Esq.
                                 Brittany A. Stevens, Esq.
                                 *Attorneys for Plaintiff*
                                 45 Broadway, Suite 620
                                 New York, New York 10006
                                 (212) 248-7431
                                 mmesidor@tpglaws.com
                                 bstevens@tpglaws.com